Good morning, Your Honor, and may it please the Court. I'm Nicholas Xenakis for Amar Endris. Your Honors, this case presents three separate issues, whether predisposition evidence was improperly omitted under Rule 404B, whether Mr. Endris was entrapped as a matter of law, and finally, whether the district court's condition of supervised release that Mr. Endris may not look at anything violent is too vague. Your Honors, I'd like to start with the second issue, that Mr. Endris was entrapped as a matter of law, but I note at the outset that this issue is closely linked to the evidentiary issue. In Jacobson, the Supreme Court held that the government agents may not originate a criminal design and plant in an innocent person's mind the disposition to commit a criminal act and then induce commission of the crime so that the government may prosecute. The Court also required that defendants promptly accept the government's offer to participate in the criminal act. There is no dispute in this case that the purchasing of a firearm with an obliterated serial number was a criminal design completely originated by the government. The idea was first proposed by the informant who did so at the direction of the handling agents, and that is at Joint Appendix 122. At the time, Mr. Endris was 19 years old. He suffered from mild autism, and he had no criminal record. His reactions to the government's offer, which was made in October, included the following. I want to do paperwork if he's going to sell it to me. That's at JA 351. It has to be legit, like I have to make him sign some papers. That's at Joint Appendix 352. And finally, I don't want it to be like it's stolen or something. That's also at Joint Appendix 352. Contact did not resume between the informant and Mr. Endris until December, almost three months later. During the sting operation, Mr. Endris reiterated to the informant, I'm trying to get that paperwork too, so I'm going to need his ID, and I'm going to need him to sign some papers. Mr. Endris said he also wanted a sales receipt. And finally, in what we offered as an obvious sign that Mr. Endris was confused about what was happening, at the conclusion of the FBI's post-arrest interview, Mr. Endris inquired whether he would be getting the firearm back. Based on those facts, and emphasizing the amount of time it took for Mr. Endris to respond to the government's offer, Mr. Endris was entrapped as a matter of law. As a matter of law? Yes, Your Honor. Based on the prompt response. If I could move to the evidentiary issue, as well. At trial, the government's initial theory was that Mr. Endris was engaged in some undefined activity involving terrorism. Once that evidence was excluded by the district judge, the government reformulated its theory of the case, and instead relied on three recorded conversations, of which it offered to show that Mr. Endris was predisposed to purchase the firearms. Nothing was offered at trial to show that any of these three conversations were more than simple... The entrapment was argued to the jury. Yes, Your Honor. So you have to say it's a matter of law to win this appeal? That's correct, Your Honor. All right. Go ahead, sir. Thank you, Your Honor. None of those three discussions, one involving a supposed cartel member, one involving a hypothetical robbery, and the other one involving a hypothetical straw purchase, nothing was offered at trial to show that any of those were more than simply talk. And in fact, we would emphasize that Mr. Endris had no connection to the criminal underworld. Nonetheless, the government... Doesn't that go to predisposition? Precisely, Your Honor. And we would offer that, as the government offered, that they went to predisposition. But they should have been, they were improperly admitted because their probative value was substantially outweighed by the prejudice that they brought. Why do you think, if it's evidence of predisposition, then is your argument 404 or 403, really? It's... Well, Your Honor, it's 404, which would include the 403 argument. We offered under 404 because, as this Court has pointed out in the McLaren case, the analysis for predisposition under 404 is somewhat different. And I would actually turn the Court to look at the McLaren case. Because there in McLaren, the defendant challenged, the defendant had been charged and convicted of a robbery. And the defendant challenged admission of evidence involving his previous possession of a firearm. This Court allowed that evidence to be introduced for two reasons. The first is that possession of the firearm was necessary to the completion of the robbery. And the second was that the firearm itself was unique. There was discussion in the McLaren case about whether the firearm could be used to, quote, chop ligaments. And this Court noted that the firearm discussed by the defendant there had unique characteristics which made it particularly powerful. In contrast to this case, the possession of a firearm with an obliterated serial number was not necessary to any of the three conversations that were admitted. Nor do any of the three conversations that were admitted even mention a firearm with an obliterated serial number. Based on that, they were improperly admitted to show Mr. Endress' predisposition. Is your argument that while he may have been, he wasn't entrapped as to accepting a firearm, he was trapped into accepting one with an obliterated serial number? Yes, Your Honor. That is correct. Because at the time, Mr. Endress was 18 years old and could legally purchase a firearm in Virginia. In fact, several of the initial interactions between Mr. Endress and the informant involved Mr. Endress going to places where he could legally purchase a firearm, such as Dick's Sporting Goods and a pawn shop. The informant, however, was instructed to discourage Mr. Endress from purchasing any sort of firearm at all. Why don't he just, if you say there's not a question of that he wasn't entrapped into getting a firearm, he was entrapped into getting a firearm with an obliterated serial  Well, Your Honor, we offer that for two reasons. The first is that the informant discouraged him. The informant discouraged him at every turn to purchase any of those firearms. And Mr. Endress was quite young and had other issues which made him susceptible to the informant's influence. And the second was that If he knew he, if your argument is he could have gotten a gun at Dick's, why was he even talking to somebody else by getting a gun for him? Well, Mr. Your Honor, the only reason he was talking about somebody else getting a gun for him would be because the government paid this informant to befriend him. But you just said you weren't arguing predisposition to get a gun. You said predisposition to get this gun. That's what your argument is. But if that's the case, why? And the second part of your argument is he could have gotten a gun a lot of places. Why didn't he go get a gun a lot of places? I mean, legitimate places. It seems to me that's inconsistent, isn't it? Well, Your Honor, I would offer that it's not inconsistent based on the specific circumstances of the case. For example, when he went to go try to purchase the firearm from the pawn shop and he looked at, there's the firearm at that specific instance was broken. And he asked the pawn shop owner whether he could purchase it if the pawn shop owner fixed it. The informant at that time strongly discouraged Mr. Endress from not purchasing it, saying that it was nothing more than a paperweight and that he should not do it. Well, he may have been right about that. Any pawn shop I've ever been in, they have more than one gun. And there's certainly more than one pawn shop around. And you mentioned Dick's. Yes, Your Honor, he went there. All he wanted to do was get a gun. He could just go get a gun. Isn't this the point that he wanted to get a gun that somehow maybe wasn't quite as traceable? Isn't that sort of what underlines this, don't you think? Your Honor, I would respectfully disagree based on Mr. Endress' conversations and comments throughout his interactions with the informant, in particular, his repeated emphasis on wanting to do paperwork and his understanding to legally purchase a firearm, he needed to show his identification. And, in fact, Mr. Endress would have been unable to purchase a firearm that was untraceable absent the government's involvement. As I mentioned, he has no criminal record, nor was he ever alleged to have any other sort of connections. So why didn't he just go buy a gun then? You think maybe the jury might be puzzled over that same point? Why didn't he just go walk into a store and buy a gun? Your Honor, I believe that he may very well have, but for the government's involvement in this case, but for the contact with the informant. So your theory of the case is he wanted a gun. You say he knows he could have bought it in any number of places, but the government convinced him not to buy a gun, but to buy a gun from them? Yes, Your Honor. Well, that's not just, you said your theory wasn't that they entrapped him into buying a gun. You said it was into buying this gun. That's two different theories. That's correct, Your Honor, if maybe I could clarify. Our theory is that the government entrapped Mr. Endress into purchasing a firearm with the obliterated serial number. There was no argument at trial, nor did we – and, in fact, we emphasized at trial that Mr. Endress did want to purchase a firearm. And we pointed out that he had visited these places where he could legally purchase the firearm, but that he had no opportunity to purchase any sort of a legal firearm, but for the government. Don't let me just make you focus on that. If there's something else you want to argue now. Your Honor, if I could also then turn to the supervised release condition as well. I would raise two points with that. The first is that under this Court's decision in Johnson, the validity of the supervised release condition needs to be addressed at this time on direct appeal. This Court has said that, as opposed to what the district court said, the condition cannot be clarified at a later date. Whether it's too vague should be decided by this Court. This Court has noted in other contexts dealing with access to media that broad bands on media are, in fact, too vague. The idea that Mr. Endress cannot look at any sort of media dealing with any sort of violence is simply too vague because he has no direction about what he has access to. And, in fact, just walking around during the day seeing the news, seeing the New York Times could potentially violate this condition. Let me ask you a practical question. Yes, Your Honor. Let's suppose we agree with you that it's overly broad. Is the solution to send it back to the district court to ask him to reword it, or is it simply, or is our only option to strike it? Your Honor, I believe that you could remand it to the district court for resentencing and allow the district court to fashion a separate supervised release condition. On that point alone? Yes, Your Honor. If that's what we want to do. Just say, be more specific on what you mean by violence. Yes, Your Honor. The, or access to any sort of information. Yes, Your Honor, that is correct. I believe this court could remand for that limited purpose. If the court has no further questions at this time, I'd reserve the rest of my time for rebuttal. Thank you. Thank you. Mr. Morgan. Good morning. May it please the court. Jack Morgan on behalf of the government. With me is John Gibbs. Good morning, Your Honor. On December 17, 2014, Amar Andrus purchased a handgun from an undercover FBI agent with an obliterated gun. Why'd you entrap him? Well, Your Honor, it's our contention, obviously, that we didn't entrap him. And defense counsel raised a number of points, you know, factual points, not only in front of this court, but it's the same arguments that they present to the jury. Namely, that Mr. Andrus was only in the market for a legal gun, that he wanted to do paperwork, and that he really never had any intention of buying an illegal weapon or an untraceable weapon. And the facts of this case and the facts that are presented to the jury really undercut that. As early as April 2014, in May 2014, Mr. Andrus made statements to the undercover to the effect that he wanted a gun that couldn't be tracked by the government. That couldn't be tracked. That could not be tracked by the government. When the recording, when he went to the July 2014 pawn shop, he indicated prior that the guy in the pawn shop was selling guns, no strings attached. When they went into the pawn shop, the only gun that he was interested in buying was a gun that didn't require paperwork. One of the arguments that they repeatedly make is, well, the CHS, the confidential human source, really had an overpowering influence on him. And it's notable that in that July pawn shop meeting, the CHS said, don't buy that gun. It's a paperweight. It doesn't work. And what did Mr. Andrus do? He made an offer for the gun. So it undercuts this claim that the CHS really had this powerful influence on him. And it should be noted that the only gun that Mr. Andrus was interested in that day in the pawn shop was the one that didn't require paperwork. The guns that were more expensive and that worked, those required papers. And he said, I'm not interested in those. After the pawn shop meeting, there's subsequent text messages and conversations, and this was all presented to the jury to the effect that Mr. Andrus wanted a gun that didn't require papers. There's a conversation where he's talking about, and this is excluding the three contested conversations that are before this Court. Do you think you're entitled to the facts viewed in the light favorable to you since you got the verdict? Yes, sir. I believe, you know, I mean, the case law makes clear that, especially in assessing the sufficiency of the evidence before this Court. There's a, the government presented an interest to the effect that Mr. Andrus went and tried to have a street purchase for a firearm. When discussing why they wouldn't purchase the firearm in a public location, he indicated, it's too hot out. I don't want to do it. And there, you know, again, in September, and continues, and with this narrow course of conduct, Mr. Andrus is on tape saying, they're talking about going and purchasing firearms, going to the pawn shop. And he says, yeah, but a pawn shop, they're going to ask me for ID, and they're going to be like, you need to be 21. There's this repeated theme. So do you think you have a better answer to my question as to why he didn't go and buy it at Dick's or somewhere else? Absolutely, Your Honor. And I think this is all prior to the government actually offering Mr. Andrus the firearm. If you look at, the case law makes it very clear that, that the point of the actual offer, a ready response, is also in and of itself sufficient to establish predisposition. And what happened when Mr. Andrus was offered the firearm? The CHS went to him and said, hey, I've got this gun, but there's something you need to know about it. It's missing its serial number, and it's illegal. He says it. And Mr. Andrus' response is, no, no, no, don't talk to me about that over the phone. That same day, they went, they met, Mr. Andrus offered for the gun $100 and some pills. The CHS turned him down because the FBI had told him, we need $300 because that's the street value of this weapon. After that initial offer, there's a two-month cooling off period where Mr. Andrus told the CHS he was going overseas. The CHS didn't push him on the gun, didn't ask him. And in December, who reinitiates? Mr. Andrus. He repeatedly texts the CHS and says, hey, remember that gun I told you to hold for me? Do you still have it? Hey, is that gun still available? The CHS then reminds him on another two occasions, the gun is missing its serial number, and he reminds him on another occasion, the gun is, it's illegal. So Mr. Andrus is told three times by the CHS it's missing its serial number. He's told twice that possession of the firearm is illegal, and yet he still goes forward with it. And I think it's notable because when we're looking at the Hunt case, for example, the Fourth Circuit, the court makes clear that a failure to withdraw is, can be evidence of predisposition. Here, there's this two-month period where the government offered, had offered the weapon once. And in this two-month period, Mr. Andrus didn't go out and buy a legal firearm. Instead, the only firearm he came back to was the firearm that had been offered by the government at one time. There's also the evidence at the time of the transaction itself of the gun sale itself that strongly suggested that Mr. Andrus knew that the firearm was again illegal. At the transaction, he kept on saying that the undercover FBI agent was making it hot. He kept on saying, your guy's making it hot. He's got to get in the car. Your guy's making it hot. At a certain point in time, he asked the undercover, where did you get the gun from? And the undercover, the undercover says, it's a hot gun. And Mr. Andrus asks, does it have any bodies on it? He clearly knew at the time of the transaction that he was not purchasing a lawful weapon. And while there is some conversations about paperwork, the overwhelming, the evidence is overwhelming that Mr. Andrus knew at the time that he was possessing a weapon, purchasing a weapon that had an obliterated serial number. At the time of the transaction, he also took out a flashlight. He looked at the gun. He turned it over. And he examined the weapon. After the fact, the FBI interviewed him after he'd been arrested. And after initially denying that he had purchased the weapon, he said, yes, I purchased the weapon. And he admitted, yes, I knew that it was missing. What about the condition of violence? So the government's can, it's the government's position that, that that condition can be read in a common sense fashion, Your Honor. I mean, the Fourth Circuit and the Fifth Circuit have indicated that when fashioning, primarily in the context of sexual, not sexual assault, but child porn cases, that broad conditions of release, sometimes that broad conditions of release, in interpreting those, that we apply a common sense understanding of, of what the court was going to get. We saw this in... Just let me ask you to stop all that presentation. What is a person to make of that? It was objective to, what's a person to make of what violence means there? Just a person who's going to be at risk if he violates that, what's he supposed to make of that? How's he supposed to, what's he supposed to do with that? Well, I mean, violence in the common parlance is, you know, a known use of, you know, physical force, right? It's, it's physical force against the use, against another's person. And, you know, the court made very clear in contextualizing that, that what she was concerned about was real world issues. Stabbing, shooting. I believe in his discretion, just like the old adage about pornography. I know it when I see it. You leave it up to him. I know violence when I see it. Yes. And, I mean, Justice Stewart made that point and it obviously, the Supreme Court, it took him 16 years to figure out what obscenity meant. And I, I think here, I think here that it's, it's contextualized in part by, by the court's statements that she doesn't want him looking at images or information relating to firearms. She doesn't want him looking at information or images relating to soldiers of fortune. And, and by her broader context in which she said, listen, there's a potent combination when we're talking about mental illness and access to firearms and that she doesn't want him involved. It, it, it seems in reading the entire sentencing transcript that she was very concerned about his involvement in like internet subcultures that might somehow influence him. As to this broader concern that, well, if he's reading the New York Times, you know, could he violate himself? You know, the Fifth Circuit and FIPS looked at this and that's one of the cases that we saw in brief and they said, listen, you know, reading the New York Times, you know, in the context of, in, in the context of information that could be considered, excuse me. Well, unless you point that he, that it's sort of a common sense approach and in the context she wants to keep him away from soldiers of fortune, those types of gun violence, those types of things. His parents were concerned about him and guns. Yep. Right? And so she's just looking at it trying to say, was it Brinkman, was this Judge Brinkman? Yes, sir. Trying to say, I want you to stay away from that. And if there's some question about it, we'll get it resolved by way of probation. I, and I think that she has, I mean, the issue that we're addressing, you know, is, is he given enough notice so that he knows that if he engages in these types, if he actively looks out for these types of images of violence, that he, you know, is it sufficiently defined or is he given enough notice as to what that could be? We're not necessarily talking about just if he's, if he's unintentionally exposed. You know, other courts, the Ninth Circuit. Who's going to have the final say within the sentencing context as to whether or not he's violated that? You know, I mean, obviously the probation officer, if they thought that there was. No, no. That's not true. No, no. I was going to say the probation officer would make a recommendation. Who has the final word? The district court, Your Honor. And, you know, in, in fifths, the court made very clear that, you know, in the context of sexually stimulating materials, that we read it in a common sense fashion, looking at like a magazine that has. Because isn't this the way it would have to work for there to be a violation of his conditions? At some point, either he would say to the probation official, or the probation official would otherwise find out, home visit or otherwise, find out they think that he's been looking at something somebody deems violent, or else he wants to look at something that probation might deem violent. At which case, either the judge would be approached by the lawyers and the probation officer, or else there would be a supervised release violation report done, and submitted to the, with his chance to respond to it, submitted to the judge. And then the judge would look at that and decide, that's not what I meant by that. I think I clearly did mean that. And if at some point somebody thought that the judge had it wrong, that that condition did not really cover that, then they could actually bring it to us, I guess. Isn't that how it works? Yes, Your Honor. And, you know, I mean, similar conditions in U.S. v. Shaw, this is a Seventh Circuit case. That court upheld a condition that the defendant was prohibited from associating with organizations or their members that, quote, unquote, espouse violence. You know, we think that's analogous in the President's case, because they could have indicated there, well, what is an organization that espouses violence? And that's really difficult for us to define. And the court there said, you know what, that's fine. Likewise, the notion that he's going to be violated for, you know, reading the You know, we're not concerned necessarily. We're not going to read this in a common-sense fashion. We're not going to apply it to newspapers or magazines that contain lingerie advertisements. You know, and there the condition was for the viewing sexually stimulating materials. So we do think that it could be read in a common-sense explanation. We do think that it would be more difficult for, you know, for the court to define in a way, you know, without being overly prolix to define the term. But if the court were to disagree, you know, we do think that the appropriate there are two kind of options as far as we understand, or two or three. You could strike it down in its entirety. You could limit it. You could impose a narrowing construction. There are other courts have done that. Or you could remand it back to Judge Brinkema. And we think any of those would also be fully appropriate. If you're going to. You want us to do one of those three? No, Your Honor. We think that it's sufficiently clear in and of itself that you could uphold the condition. With respect to the predisposition argument, in the briefs the defense makes a rather novel claim, especially with focusing on the McLaurin case. And they say that there's a per se bar on the use of extrinsic evidence in assessing predisposition. You know, McLaurin has no discussion on a distinction between intrinsic or extrinsic evidence. And, you know, the court makes clear that the past conduct doesn't need to be identical to the crime charge. Rather, the crime only need to be similar enough and close enough in time to be relevant to the matter at issue. And I think it's important that, you know, the underlying purpose of the predisposition inquiry is for the court to assess the defendant's state of mind before the government makes any suggestion that he commit the act. And if the defense is correct in that extrinsic statements can't go to that, it leads to a somewhat perverse outcome where I could tell my best friend that I have an intention to rob a bank. A series of time could go on. And then an undercover, I could get involved in an undercover agent. And that prior statement, because it was an intrinsic, wouldn't necessarily be admissible. So you don't draw a distinction between words and deeds as far as predisposition evidence goes? I don't think the case law draws it. I don't draw that distinction, and the case law doesn't draw that distinction. You know, in Skillicote, the court here made very clear that prior statements that had been prior statements, and these are statements that occurred months previously to an undercover, that those prior statements were proper evidence of the defendant's predisposition. The Second Circuit in Cromity says, really, you know, we're more concerned about actions, but statements. It's less likely that a statement from a person is going to be prompted by the government. And so it's one of the clearest indicia of the person's intent. And so I think under those circumstances, because fundamentally we're trying to assess whether it's an unwary innocent or an unwary criminal. And what that person is saying within the context of, you know, the limitation has to be similar enough in time and close enough in the subject matter. You know, this isn't just, we're not just letting in all general criminality. And that seems to be the concern that the defense is going at, is that this is going to open the barn door. And there's an active limitation there. So I don't think that that's the case. They also, in their briefs, they talk about how evidence after the government is introduced to the defendant, that that evidence isn't permissible. And they cite for that premise Jacobson and Brandt. This court in Skillicote, the Second Circuit in Cromity clearly addressed that point. And they say, and they make clear that all of the evidence, the evidence even after the government has made conduct is relevant towards the determination of whether the defendant's conduct was independent. And so I would point the court in that direction. Finally, in their briefs and here again, the defendants made the repeated arguments that these three contested statements were integral to the government's case. And I think in my factual recitation earlier, I kind of debunked that. But just to kind of put a gloss on it, you know, they say that these three statements were the central points in the opening and closing arguments, that they were kind of the linchpin to our case. These three statements were never mentioned in opening arguments. They were mentioned once each in closing argument. And they were mentioned solely within the context of the argument. I can assure you we're not going to base a decision on how many times it's mentioned in an argument. Absolutely, Your Honor. And my sole point is just that in the light of the other evidence, that these weren't a critical portion of the government's case. But they were important to you, weren't they? They were important. Are you just introducing stuff to pass? No, we clearly thought that they were relevant evidence that went to his predisposition. When you say relevant, I said they're important to you, aren't they? You sure wanted to use them, so I don't know why you're protesting against myself. No, and really all I'm saying here is that if some of these statements were properly admitted or the court were, that we would think that they're harmless error given the fact that they weren't emphasized in opening and closing arguments, and they really weren't what the government centrally focused on when it presented its case to the jury. Okay. I think we understand your argument, Mr. Morgan. Thank you. Thank you. Mr. Platt. Your Honors, I'd like to start by addressing Judge Shedd's point about clarification of the supervised release condition later on. I believe, Your Honor, that in fact this Court could not clarify that condition later on. If Mr. Endress is found to violate that condition and Judge Brinkman determines that the material that he viewed would be in violation, and we contested that below, I don't believe that this Court could address the merits of that violation given how broad it is. Why couldn't we say you can't punish him for that because there's just not a fair reading of that. It doesn't give somebody notice of it. Because, Your Honor, I believe the Jacobson case says that in understanding the scope of the supervised release condition, that has to be determined now as opposed to after Mr. Endress potentially violates. And I believe that makes sense, Your Honor, because one of the— Well, what if she says you can't have a gun and they're violating him for having a water pistol? We can say that. That's not an appropriate violation because no fair person would understand that to be the reading of the word gun. I think that's correct, Your Honor, but I would offer that— I hope that's correct. Your Honor, I would offer that would be a factual dispute as opposed to here, which I believe that we're much more into a legal question about exactly how broad— No, it's not. The question of what is violence and what's the fair reading of violence under that condition. Wouldn't it be the exact same analysis? Wouldn't she say, well, I meant that—I don't know what she would say, but she did say, well, I'm violating, you have violated, I'm revoking your supervised release because you did something that violated my prohibition on violence, publications which portray or have something to do with violence. And if you're a competent enough lawyer, you'd bring that right to us and go, you can't possibly be punished for that because he wasn't on fair notice of that. And we would go, you know what, maybe you're right about that. He had no idea to know that he couldn't walk down the street or watch CNN or what's happening, say, in Charlotte. That's violence. Of course he can watch that. I think this court would go, that absolutely is not within the fair reading of the condition. I'm not saying that's what we have to do, but I'm saying it seems to me that's one way in a common-sense approach that you would get to a remedy on that. Your Honor, that could very well be a possibility. But in doing that, we would still have to go through the process which Your Honor pointed out a second ago, which is that Mr. Andrews would still be technically violated. He would intentionally still have to serve a sanction at the time of found in violation below, even if we appealed it to this court. And I think that is why it's so important to have notice and clarification now about what that condition means, especially as opposed to dealing with a circumscribed issue. For example, what would define a firearm as opposed to what would constitute violence, which is much broader and much vaguer. So I think the specifics of the condition itself would warrant clarification at this time as well. I believe the government's argument, and turning to the evidentiary and predisposition issue, I think the government's argument a second ago also is that the government was allowed to depict that trial that Mr. Andrews was a hardened criminal. Even though he was 19 years old, had no criminal record, and had no previous connections to, as far as we know, anybody with any sort of criminal record aside from the government informant, yet the government was able to use these conversations, was able to use the recorded conversations with the informant to depict him as somebody who he was not. And the government's offering of such statements that Mr. Andrews said, I want a gun that's untraceable, was the only conversation that was unrecorded in conversation with the informant. Based on that, Your Honor, we would ask that this court remand the case to the district, find that Mr. Andrews was entrapped as a matter of law, remand this case to the district court, or in the alternative, remand this case to the district court for resentencing. Thank you, Your Honors. Thank you. We'll come down. Keep going. I'm good. Yeah. Keep going. We'll come down and greet counsel and then go into our next case.
judges: William B. Traxler Jr., Dennis W. Shedd, Henry F. Floyd